IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADALBERTO CASTRO, | ) |
|     Plaintiff, | ) Civil Action No. 3: 14-cv-00273 |
| v. | ) United States District Judge |
| | ) Kim R. Gibson |
| SUPERINTENDENT GLUNT, et al., | ) United States Magistrate Judge |
| | ) Cynthia Reed Eddy |
|     Defendants. | ) |

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

**I. RECOMMENDATION**

For the reasons set forth below, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 66) be granted.

**II. REPORT**

    A. <u>Relevant Procedural History</u>

Plaintiff, Adalberto Castro ("Plaintiff" or "Castro") is a state prisoner committed to the custody of the Pennsylvania Department of Corrections ("DOC") and currently confined at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"). Castro brings suit pursuant to 42 U.S.C. § 1983 against a number of DOC officials and employees for alleged violations of his Eighth and Fourteenth Amendment Rights. Specifically, Castro brings (1) a Fourteenth Amendment due process claim alleging that his rights were violated when he was placed in in the Security Threat Group Management Unit ("STGMU") without notice or a hearing and (2) an Eighth Amendment condition of confinement claim alleging that while in the STGMU program, he was subjected to cruel and unusual punishment.

Discovery is complete and Defendants have filed the instant Motion for Summary Judgment, with brief in support. (ECF Nos. 66 and 69.) Castro has filed a Brief in Opposition to

1

Defendants' Motion for Summary Judgment. (ECF No. 71.) The issues have been fully briefed and the factual record has also been thoroughly developed. (ECF Nos. 67, 68.) The motion is ripe for disposition.

B. <u>Relevant Factual History</u>

The Court has viewed the summary judgment record in the light most favorable to Castro.

Defendants filed the instant motion for summary judgment in which they argue that Castro's due process claim fails because placement in the STGMU did not trigger a liberty interest and that his Eighth Amendment claim fails prison officials did not act with deliberate indifference when they recommended and placed Castro in the STGMU. Castro filed a well-argued, detailed response in opposition.

In August 2004, Castro began serving a sentence of 20 to 40 years imprisonment for Criminal Attempt to Commit Murder (1st Degree) at SCI-Graterford, a prison operated by the Pennsylvania Department of Corrections. *See* Cell History (ECF No. 68-2, Exh. 7). He has a long history of misconducts, including multiple fights and assaults, and spent most of his first 7 years in the RHU serving disciplinary custody sanctions. *See* Cell History and Misconduct Report (ECF No. 68-2, Exhs. 7 and 8). Castro was a validated member of the Bloods gang. Declaration of David J. Close, Deputy Superintendent of Centralized Services at SCI-Houtzdale (ECF No. 68-2, Exh. 10, ¶ 3). He had numerous separations from a number of other inmates, the majority being due to gang-related activities or violence. *Id.* Before being transferred to SCI-Houtzdale, Castro had two previous gang-related transfers. (ECF No. 68-2, Exh. 7; Exh. 10, ¶ 3.) On September 22, 2011, he was transferred from SCI-Greene to SCI-Houtzdale, following his involvement in a plot to assault members of the SCI-Greene search team.

Upon arrival at SCI-Houtzdale, Castro was housed in RHU. On October 3, 2011, Castro was released from RHU and placed in general population. Approximately three months later though, he received a misconduct for possessing a 6" antenna that was sharpened to a point. He pled guilty and was sentenced to 60 days in disciplinary custody in the RHU. (ECF No. 68-2, Exh. 12.) Based on this incident, criminal charges were filed against Castro in Clearfield County. He pled guilty to possessing a prohibited offensive weapon and received a 1 to 2 year concurrent sentence. (*Id*., Exh. 13.)

Castro was released from RHU on March 15, 2012 and returned to general population. (*Id*., Exh. 7; Exh. 10, ¶ 4.) He received a series of misconducts on May 11, 2012 and was returned to the RHU. The cited infractions included allegations that Castro was engaging in prohibited group activity in the yard with other Blood members, even though he had been given a direct order to cease that type of activity, that he refused orders to cuff up for escort to the RHU, and that he refused to take a cell mate. Castro pled guilty to the misconducts and received an additional 30 days, taking his disciplinary custody time through October 7, 2012. (*Id*., Exh. 8, 14.)

In July 2012, Defendants Captain Brumbaugh, Deputy Hollibaugh, Deputy Close, and Superintendent Glunt and Major Barrows, who is not a defendant in this lawsuit, voted to recommend Castro for placement in the STGMU program. In doing so, they reviewed and considered Castro's criminal and DOC history, which included, *inter alia*, a substantial misconduct history, his long term RHU confinement, his validated status as a member of the Bloods going back many years, his regular contact with gang members in PA and New York, and his continued involvement and leadership in gang-related activity. (*Id.,* Exh. 10, ¶¶ 7 and 12.) The SCI-Houtzdale recommendation was reviewed and approved by DOC Management

personnel outside of the institution. Plaintiff was transferred to the STGMU at SCI-Greene on August 21, 2012.

C. The STGMU Program and Conditions

The STGMU is a non-punitive program that opened at SCI-Greene in August 2012. The program is designated for inmates who have poor prison adjustment, numerous misconducts, and/or known gang affiliations through a validation process which is overseen by the DOC's Office of Special Investigations ("OSI"). Declaration of Stephan Longstreth, Unit Manager of the STGMU at SCI-Greene (ECF No. 68-1; Exh. 1, ¶ 2.) The goal of the STGMU program is to change inmates' behavior via movement through five phases of programming and take steps toward being able to return to a general population setting. The program uses a variety of programs, in-cell training and video tools, progressive privileges, including commissary, out-of-cell activities, group meals, and close monitoring by Unit Team and psychology staff to assure that inmates progress and achieve the benefits of the program. *Id*. An inmate's progression through the STGMU's five program levels is based on his or her satisfactory compliance and completion of behavioral and programming objectives specific to each level as evaluated by the STGMU Unit Team.

Inmates are technically coded as "AC status" while in the STGMU program and are housed in several pods of I Block, which is an "RHU" block setting, where inmates are single-celled. (*Id.* at ¶ 3.) Starting with Phase 4, inmates in the program have increasing opportunities for out-of-cell and group activities and privileges. (*Id*. at ¶ 3; Ex. 2, STGMU Handbook and Privileges Chart.) As inmates progress through the program, they move to different pods and achieve more freedom and privileges. (Exh. 1, ¶3.)

The STGMU program encompasses five steps or phases and each phase offers progressively more privileges and services. (*Id*. at ¶ 4; Exh. 2 at 3-4.) The phases are explained in the STGMU Handbook which is provided to each inmate in the program and the STGMU Unit Team also meets with the inmate upon arrival to go over the program in detail. There is an STGMU Program Plan for each phase which reflects the goals and action steps specific to the individual inmate. All inmates are afforded the opportunity to participate in one hour of outdoor yard exercise five days a week, and as the inmate progresses, that exercise can occur in groups. (*Id*. at ¶ 4.)

Generally, the five STGMU phases each last a minimum of 90 days and can be longer depending on inmate progress and behavior. (*Id*. at ¶ 5.) As the inmate progresses through the program, privileges are steadily increased. When inmates reach Phase 1, they are given the opportunity to select their preferred region to be housed in to complete Phase 1 of the program, along with a temporary Z code, as they reintegrate into the general population setting. Phase 1 consists of a minimum of 180 days in general population.

D. *Castro's Experience in the STGMU*

The summary judgment record reflects that Castro arrived at SCI-Greene on August 21, 2012. Within days of his arrival, he met with members of the Program Review Committee who advised him that he had been placed in the STGMU and that any program progression questions would be addressed through the Unit Team. (ECF 68-1, Exhs. 4 and 5). Castro filed an administrative grievance under DC-ADM 802 contesting his STGMU placement, which was rejected by the Grievance Officer and Superintendent, whose decisions were upheld by the Secretary's Office of Inmate Grievances and Appeals. (ECF No. 68-2, Exh. 9.)

Castro was in Phase 5 from August 21, 2012 to May 13, 2013. He incurred a misconduct while in the program on October 24, 2012, and was transferred out of Block I to the RHU. *See* Misconduct Report. (ECF No. 68-1, Exh. 3 at 32- 36.) He "recommenced" Phase 5 in January 2013. Castro entered Phase 4 on May 13, 2013 and completed this phase on August 28, 2013. During his time in Phase 4, Castro received the Phase 4 privileges, including the opportunity to have day room time out of his cell.

On August 28, 2013, Castro entered Phase 3. During this time, Castro moved to a new pod, received additional commissary privileges, visitation, and was placed on the general labor pool. Castro successfully completed Phase 3 and on November 22, 2013, he entered Phase 2. During Phase 2, Castro worked on the housing unit, performing chores such as cleaning showers. He attended group activities such as dayroom, program groups, and group yard. He had the freedom to move unrestrained around the housing unit. On April 1, 2014, the Program Review Committee met with Castro and informed him of his placement in Phase 1. On May 1, 2014, Castro was transferred to SCI-Mahoney to begin Phase 1.

On May 13, 2014, Castro was moved within SCI-Mahoney to general population and given Z code status. On August 17, 2014, Castro was involved in a fight in the dining hall. Investigation by SCI-Mahanoy Security revealed that the fight was gang related and that Castro had a "hit" placed on him due to active recruitment of rival gang members. (ECF No. 68-1; Exh. 1, ¶ 7.) On August 18, 2014, Castro was transferred to RHU. On September 17, 2014, Castro was deemed to be a Phase 1 STGMU failure. However, on November 19, 2014, Castro was approved to be returned to the STGMU and on or about November 25, 2014, he was transferred back to SCI-Greene for re-entry into the STGMU program. He started over in Phase 5 and steadily progressed through the program. He was approved to move to Phase 4 on December 29,

2014; was approved to move to Phase 3 on March 20, 2015; was approved to move to Phase 2 in July of 2015; and eventually was approved to move to Phase 1 on November 2, 2015. He was transferred to SCI-Dallas on December 15, 2015 and placed in general population on December 17, 2015. Cell History. (Exh. 68-2; Exh. 7.)

      E.      <u>Standard of Review for Motion for Summary Judgment</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co.,* 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex,* 477 U.S. at 322. *See also Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 F. App'x 211, 213 (3d cir. 2010) (quoting *Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the Court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Batsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). *See also El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

D.  Discussion and Analysis

First, the Court will discuss Castro's Fourteenth Amendment due process claim and the DOC's response. With respect to this claim, the Court recommends that defendants are entitled to summary judgment as Castro has failed to establish that his confinement in STGMU imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life and, therefore, he did not have a liberty interest in avoiding being placed in the STGMU program. Next, the Court will turn to Plaintiff's Eighth Amendment claim and the DOC's response. The Court recommends that defendants are entitled to summary judgment on this claim as well.

1.  *The Due Process Clause of the Fourteenth Amendment*

The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir. 2000). Only if a plaintiff establishes that the nature of the interest is one within the contemplation of the liberty or property language of the Fourteenth Amendment,

is the second step, i.e., determining what process is due, necessary. *Id*. A liberty interest may arise from the Constitution itself or from an expectation or interest created by state laws or policies. *Wilkinson,* 545 U.S. at 221.

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. In the prison context, a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). The determination of what is "atypical and significant" is based on the range of conditions an inmate "may reasonably expect to encounter as a result of his or her conviction." *Asquith v. Dep't of Corr.*, 186 F.3d 407, 412 (3d Cir. 1999).

In *Sandin v. Conner*, the United States Supreme Court held that an inmate's assignment to disciplinary segregation for thirty days did not impose an "atypical and significant deprivation" that implicated an inmate's liberty interest. 515 U.S. at 486. In reaching this conclusion, the Supreme Court explained that disciplinary segregation at the prison generally "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," the inmate's confinement in segregation "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and the inmate's segregation would not "inevitably affect the duration of his sentence." *Id.* at 486-87.

The Supreme Court was confronted with a much different situation in *Wilkerson*, where it held that placement in Ohio's maximum-security prison, the Ohio State Penitentiary ("OSP"), implicated an inmate's liberty interest because such an assignment "impose[d] an atypical and significant hardship under any plausible baseline," and listed several factors that distinguished such confinement from the disciplinary segregation at issue in *Sandin*:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. . . . While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. . . .

*Wilkinson*, 545 U.S. at 223-24 (citations omitted).

The United States Court of Appeals for the Third Circuit has repeatedly found that placement in the much stricter New Jersey STGMU does not implicate a liberty interest. *See Harris v. Ricci*, 595 F. App'x 128, 131 (3d Cir. 2014); *Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002). The New Jersey Department of Corrections policy was promulgated in 1998 and is designed to isolate and rehabilitate gang members. *Id*. at 509. Under this policy, prison officials can designate Security Threat Groups ("STG") and transfer the "core" members of these groups to the STGMU. The STG policy lists criteria for prison officials to consider in determining whether a particular inmate should be classified as an STG member. These include: (1) an inmate's acknowledgement of membership; (2) the presence of an STG tattoo; (3) the possession of STG paraphernalia; (4) information from an outside agency; (5) information from an Internal Affairs report or investigation; (6) correspondence from other inmates or outside contacts; (7) STG photographs, and (8) any other factors that suggest that the inmate is involved in STG activities or is a STG member. Any inmate who satisfies two of these criteria may be designated as an STG member. An inmate remains in maximum custody in the New Jersey STGMU

> until the inmate successfully completes a three-phase behavior modification and education program. This program is designed to give the inmate the insight and tools necessary to interact appropriately, without the perceived need of membership in a Security Threat Group. The inmate is taught anger management, conflict resolution, and social interactive skills that feature alternatives to violence. The Committee monitors the inmate's progress and determines whether the inmate should advance to the next phase and eventually return to the general prison population. In order to complete the program and return to the general prison population, an inmate must sign a form renouncing affiliation with all STGs.

*Fraise,* 283 F.3d at 510. The appellate court found that despite additional restrictions, the New Jersey prisoners had no liberty interest in avoiding placement in the STGMU. The plaintiffs were not subjected to confinement that exceeded the sentences imposed upon them or that otherwise violated the Constitution, and therefore no liberty interest created by the Due Process Clause itself was imposed. *Id.* at 522.

In the instant case, Castro does not allege any greater restrictions in the STGMU at SCI-Greene than were placed on the inmates housed in the New Jersey STGMU in *Fraise*. He was not subjected to confinement that exceeded his sentence and, as discussed below, his confinement in STGMU did not otherwise violate the Constitution. The Court finds that Castro has failed to establish that his confinement in STGMU imposed an atypical and significant hardship on him relative to the ordinary incidents of prison life and, therefore, he did not have a liberty interest protected by the Due Process Clause. Castro also has not demonstrated that he was deprived of any expectation or interest created by state laws or policies. Therefore, the Court recommends that summary judgment be granted to Defendants on Plaintiff's due process claim.

2. *Conditions of Confinement Claim Under the Eighth Amendment*

Under the Eighth Amendment, prisoners are protected from cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825 (1994). Cruel and unusual punishment will only be found "where viewing the totality of the conditions in the prison, the inmate's conditions of

confinement, alone or in combination, deprive him of the minimal civilized measure of life's necessities." *Tillery v. Owens*, 907 F.2d 418, 426-27 (3d Cir. 1990). In the non-medical context, the Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish an Eighth Amendment claim based on prison conditions, the plaintiff must show "he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference." *Farmer*, 511 U.S. at 834. An objectively, sufficiently injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, water, shelter. *Rhoades v. Chapman*, 452 U.S. 337, 347 (1981).

To the extent that Castro alleges a violation of his Eighth Amendment rights, he has not demonstrated (1) that his placement in the STGMU resulted in the denial of any basic human need or (2) that he was incarcerated under conditions posing a substantial risk of harm, or (3) that prison officials demonstrated a deliberate indifference to his health or safety. The summary judgment is void of any showing of deliberate indifference on the part of any defendant. Rather, the summary judgment demonstrates that Castro's designation to the STGMU was the result of his own history of misconducts, his long history of RHU confinement, and his known gang-related activity and leadership status.

Accordingly, the Court recommends that summary judgment be granted to Defendants on Plaintiff's conditions of confinement claim.

## III. CONCLUSION

For all of the foregoing reasons, it is recommended that Defendants' Motion for Summary Judgment be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(D)(2) of the Local Rules for Magistrates Judges, the parties are allowed fourteen (14) days after service of this Report and Recommendation to file Objections to this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days after date of service to respond to the objections. Failure to file Objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

Dated: October 19, 2016

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc: ADALBERTO CASTRO
FX-6703
SCI Dallas
1000 Follies Road
Dallas, PA 18612
(via U.S. First Class Mail)

Mary Lynch Friedline
Office of Attorney General
(via ECF electronic notification)